959 F.2d 237
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Reginald C. WILLIAMS, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 91-1976.
 United States Court of Appeals, Sixth Circuit.
 April 6, 1992.
 
 Before MILBURN and SUHRHEINRICH, Circuit Judges, and TIMBERS, Senior Circuit Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff Reginald C. Williams appeals the district court's grant of summary judgment which affirmed the Secretary's denial of his claim for social security disability and supplemental security income benefits. The sole issue presented for review is whether the Secretary erred in finding that plaintiff was not disabled prior to August 11, 1987. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 Plaintiff filed applications for Social Security disability and supplemental security income benefits on August 28, 1984.[1] He alleged that he became unable to work in January 1980 at the age of 23 due to a right knee injury, emotional problems, and a heart condition. Plaintiff's applications were denied initially and on reconsideration. On November 19, 1985, an Administrative Law Judge (ALJ) remanded plaintiff's claims for a new determination to be made under new rules promulgated pursuant to the Social Security Disability Benefits Reform Act of 1984. Plaintiff's applications were again denied on initial review and on reconsideration. Following an administrative hearing, an ALJ denied plaintiff's applications for benefits in a decision dated June 2, 1987. The Appeals Council denied plaintiff's request for review of this decision on November 6, 1987.
 
 
 3
 On December 30, 1987, plaintiff sought judicial review of the Secretary's final decision in the district court. On June 28, 1988, the court remanded the case to the Secretary for further administrative proceedings. The Appeals Council then remanded the case to an ALJ with orders to complete the administrative record and to return the record with a recommended decision.
 
 
 4
 In his recommended decision on remand, the ALJ found that plaintiff had arthritis of the right knee, a substance abuse disorder, and a personality disorder, but that these impairments, either singly or in combination, did not meet or equal in severity the criteria of any section in the listing of impairments. The ALJ also found plaintiff's testimony to be credible and concluded that plaintiff could not return to his past relevant work. The ALJ concluded that prior to March 14, 1988, plaintiff retained the residual functional capacity to perform light work that was non-stressful and did not require significant interpersonal or public contact. Based on the vocational expert's testimony, the ALJ found that there were a significant number of light jobs that plaintiff was able to perform, and that plaintiff became disabled on March 14, 1988.
 
 
 5
 Plaintiff sought review from the Appeals Council. In a decision issued on November 28, 1989, the Appeals Council adopted the ALJ's decision; however, it determined that plaintiff became disabled on August 11, 1987. The Appeals Council also found that plaintiff was not disabled prior to August 11, 1987, since there were a significant number of light jobs that he could perform prior to that date. This determination became the final decision of the Secretary.
 
 
 6
 Plaintiff again sought judicial review in the district court. Plaintiff argued that the Secretary had erred in not finding that he had been disabled prior to December 31, 1984, the date his insured status ended. On July 18, 1991, the district court granted summary judgment in favor of the Secretary, concluding that the Secretary's decision was supported by substantial evidence.
 
 B.
 
 7
 Plaintiff was born on February 12, 1956, and was 33 years of age at the time of the Secretary's final decision on November 28, 1989. Plaintiff injured his knees while playing high school football. While in the eighth or ninth grade, he suffered chest pains and was told he had angina. After dropping out of school in the eleventh grade, plaintiff was employed as a dishwasher from December 1973 to February 1974.
 
 
 8
 Plaintiff enlisted in the army in November 1974. On January 15, 1977, plaintiff's right leg was injured in an accident involving an overturned tank. In February 1977, plaintiff experienced chest pains; however, medical tests performed at that time revealed nothing.
 
 
 9
 Plaintiff left the army on October 31, 1977. A physical examination performed at that time by Dr. Jannings noted that plaintiff experienced chest pain and shortness of breath due to anxiety, and that no organic basis for the problems could be found. Dr. Jannings described plaintiff as experiencing "depression, excessive worry, and overall nervousness" due to his return to civilian life.
 
 
 10
 Plaintiff earned his G.E.D. after leaving the military. From 1978 to January 1980, he held five different jobs, including automobile service writer, route salesman, and office clerk. During this period of time, he reinjured his right knee.
 
 
 11
 In May and June 1981, plaintiff sought treatment at a Veterans Administration medical clinic for a painful right knee. However, no problems were diagnosed with the knee.
 
 
 12
 In January 1982, plaintiff sought treatment for chest and right knee pain. Again, no specific diagnosis was made on this occasion. In April 1983, plaintiff was treated at the emergency room of a Grand Rapids, Michigan, hospital for right knee pain. This resulted in an arthrogram of plaintiff's right knee which diagnosed a small tear in the medial meniscus. Arthroscopic surgery to repair the knee was recommended on June 17, 1983. Plaintiff, however, was unable to arrange for treatment through the Veterans Administration.
 
 
 13
 In June and October 1983, plaintiff complained of chest pain, but nothing was revealed by the objective medical evidence. In January 1984, plaintiff requested treatment from the Veterans Administration for his knee pain, and he also requested counseling because he had made a poor adjustment to civilian life, was having a problem keeping jobs, and had been unemployed for three years. Plaintiff again requested treatment for his right knee in April 1984.
 
 
 14
 In February 1984, Dr. Arsenio Ablao performed a psychiatric examination of plaintiff. Plaintiff told Dr. Ablao that as a result of his right knee pain, he had become irritable, depressed, and experienced insomnia and headaches. Plaintiff also indicated he needed a cane to walk, that he engaged in minimal activities, and had few friends. Dr. Ablao described plaintiff as anxious, nervous, upset, and engaging in paranoid thinking as a result of his treatment by the Veterans Administration. Dr. Ablao stated that plaintiff's physical condition was affected by psychological factors, and he diagnosed a passive-aggressive personality disorder. Dr. Ablao described plaintiff's mental status as fair.
 
 
 15
 In October 1984, plaintiff was examined by Dr. Clinton Harris, a specialist in internal medicine. Dr. Harris indicated that plaintiff's chest pain was not anginal, and he also found that plaintiff suffered from significant knee pain.
 
 
 16
 In October 1984, Dr. Ablao performed another psychiatric examination of plaintiff. Dr. Ablao noted covert hostility, paranoid thinking, and depression. Dr. Ablao diagnosed paranoid schizophrenia and stated that plaintiff's prognosis was guarded.
 
 
 17
 Plaintiff's insured status for Social Security disability benefits ended on December 31, 1984. On March 21, 1985, plaintiff went to the Veterans Administration Clinic complaining of low back pain, spots before his eyes, knee pain, and chest pain. He also complained of dizziness and throbbing headaches.
 
 
 18
 On October 25, 1985, plaintiff went to the Veterans Administration Clinic. He was hospitalized because he was hyperventilating. No organic basis was found for his chest pain.
 
 
 19
 Dr. Ablao performed a third psychiatric examination of plaintiff on March 25, 1986. Dr. Ablao considered plaintiff's thought patterns to be reasonable; however, he described plaintiff as restless, nervous, covertly hostile, engaging in paranoid thinking, and suffering frequent insomnia and nightmares. Dr. Ablao diagnosed borderline personality disorder, a prior knee injury, and ruled out paranoid schizophrenia.
 
 
 20
 Dr. John S. Cowan, a specialist in internal medicine, performed a disability determination examination on April 22, 1986. During the examination, plaintiff complained of knee and chest pain, emotional problems, and a drug problem as well. Dr. Cowan reported that plaintiff stated that he began using illicit drugs eight or nine years earlier. Plaintiff also indicated that the Veterans Administration was going to admit him to a drug detoxification program. Dr. Cowan noted that plaintiff was very tense, uptight, and that his arms were extensively covered with obvious evidence of frequent intravenous injections. Dr. Cowan concluded that the previous arthrogram definitely showed a torn medial meniscus which accounted for the knee pain. He opined that surgery would help this condition. He also noted that plaintiff definitely appeared to have a considerable emotional problem, that his chest pains were related to his emotional problems, and that plaintiff was a drug addict.
 
 
 21
 In May 1986, plaintiff was admitted to the Veterans Administration Medical Center in Battle Creek, Michigan, for psychological testing; however, plaintiff left the Center prematurely on June 7, 1986. Dr. Won Park stated that he did not think that plaintiff had good motivation for treatment for his emotional problems and that plaintiff could return to his pre-hospitalization activities.
 
 
 22
 During his hospitalization, a psychological assessment was performed by V. Bruce Vreeland, Ph.D. Plaintiff informed Vreeland that he increased his drug use during the previous three or four years, that he used drugs to help with the pain in his knees, that he had been fired from several jobs, and that he had tried college classes but had not completed the courses. Dr. Vreeland noted that plaintiff's highest level of adaptive functioning over the course of the previous year was poor to very poor. Dr. Vreeland's clinical impression was that plaintiff was a passive dependent personality whose problems were exacerbated by psychological and/or organic effects of accidents in the service and subsequent experience of failure compounded by drug abuse.
 
 
 23
 Plaintiff was again hospitalized at the V.A. Medical Center from July 13, 1986 to August 17, 1986. The diagnosis was mixed substance dependence, borderline personality disorder, chronic right knee pain, and thrombosis with an old hematoma due to injections of Talwin. The impression of Dr. Won Park, the attending physician, was that plaintiff would return to his pre-hospital level of activities following his hospitalization.
 
 
 24
 On October 3, 1986, plaintiff consulted with a social worker, Clarice Kwant, based upon a referral from Dr. Vreeland. The social worker concluded that plaintiff had difficulty with impulse control and was rationalizing his drug habits and hostile behavior as a result of the knee pain that he had been experiencing for a long period of time.
 
 
 25
 In August 1987, plaintiff was hospitalized due to substance abuse. In March 1988, plaintiff sought to attend a rehabilitation center for drug and alcohol abuse. Office notes from March 14, 1988, reveal that plaintiff exhibited paranoid behavior, was withdrawing from others, and was not taking care of his personal needs.
 
 
 26
 Don L. Van Ostenberg, Ph.D., performed a psychological evaluation of plaintiff in November 1988. Dr. Van Ostenberg reported that plaintiff was reasonably cooperative, but obviously highly anxious, emotionally distressed, and the demands of the evaluation process exceeded his tolerance for objectivity. Based upon a review of the records, Dr. Van Ostenberg concluded that plaintiff suffered organic brain damage which was obscured by his psychopathology. Van Ostenberg thought this might be related to the 1977 tank rollover accident as well as the long-term effects of heavy drug and alcohol abuse. Dr. Van Ostenberg's diagnosis was borderline personality disorder, possible paranoid schizophrenia, and knee and back pain. He concluded that plaintiff had acquired organic brain damage and was not employable in any capacity at that time. Dr. Van Ostenberg also stated that he did not "believe" that plaintiff had been employable since 1980 or thereabouts when his emotional distress and drug usage appears to have escalated to the point where he was non-productive. Dr. Van Ostenberg stated that without extensive treatment one could not expect plaintiff's condition to change in the foreseeable future and that his prognosis was poor.
 
 
 27
 Before the ALJ, plaintiff testified that he was unable to work due to pain in his knees and back and because of arthritis in his hands and fingers. He testified that he experienced chest pain, but that nothing was wrong with his heart. He stated that he had anxiety attacks and a problem with drugs.
 
 
 28
 Plaintiff also testified that he did some house work, including vacuuming, and yard work, including cutting the grass and washing his van. He went grocery shopping and went for walks. Plaintiff cared for his children during the day while his girlfriend worked. Plaintiff's girlfriend testified that in September 1984, plaintiff attended auto mechanic school daily from 9:00 a.m. to 5:00 p.m., and that he had a passion for bars and going out alone. Plaintiff's instructor at the auto mechanic school testified that plaintiff was frequently absent during the semester, but that when he attended, he did well, had good concentration, responded well to direction, and got along well with the other students. Plaintiff eventually accumulated too many absences to pass the course.
 
 
 29
 At plaintiff's final hearing before the ALJ, plaintiff testified that he had knee surgery in October 1987, and described his knee problems as having been "fixed." However, he testified that he was experiencing back problems as the result of a spinal anesthetic given at the time of his knee surgery.
 
 
 30
 John Petrovich also testified at the hearing as a vocational expert. In response to a hypothetical question posed by the ALJ, Petrovich testified that if plaintiff were capable of performing light work which was non-stressful and did not require significant public or interpersonal contact, he would be able to perform more than 100,000 jobs in the state of Michigan as an assembler, janitor, machine operator, and non-retail clerk.
 
 II.
 
 31
 Plaintiff argues that substantial evidence exists to show that he was not capable of substantial gainful employment prior to December 31, 1984. Specifically, plaintiff argues that two professional opinions, Dr. Ablao's opinion of October 1984, and Dr. Van Ostenberg's opinion of November 1988, show that as of October 1984, plaintiff was incapable of substantial gainful employment.
 
 
 32
 Pursuant to 42 U.S.C. § 405(g), this court reviews the district court's conclusions in social security cases de novo, Crum v. Sullivan, 921 F.2d 642, 644 (6th Cir.1990); however, the court's scope of review of the Secretary's decisions is limited to inquiring whether the Secretary's findings are supported by "substantial evidence." See Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Substantial evidence "is more than a mere scintilla, but only that much evidence required to prevent a directed verdict." See Foster v. Bowen, 853 F.2d 483, 486 (6th Cir.1988). This court may not review the Secretary's decision de novo, nor make credibility determinations, nor weigh the evidence, Garner v. Heckler, 745 F.2d 383, 387 (6th Cir.1984), for these functions are left to the Secretary's discretion. Young v. Secretary of Health and Human Services, 787 F.2d 1064, 1066-67 (6th Cir.), cert. denied, 479 U.S. 990 (1986). In reviewing for substantial evidence, this court must examine the record taken as a whole and must take into account whatever in the record fairly detracts from its weight. See Allen v. Califano, 613 F.2d 139, 145 (6th Cir.1980); Beavers v. Secretary of Health, Educ. & Welfare, 577 F.2d 383, 387 (6th Cir.1978). If it is supported by substantial evidence, the Secretary's determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently. See Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir.1983) (per curiam).
 
 
 33
 A social security disability claimant bears the ultimate burden of proof on the issue of disability. See Richardson v. Heckler, 750 F.2d 506, 509 (6th Cir.1984). The claimant's specific burden is to prove that he became disabled prior to the expiration of his insured status. See Moon v. Sullivan, 923 F.2d 1175, 1182 (6th Cir.1990). Since a claimant must establish disability prior to the expiration of his insured status, post-expiration evidence must relate to the claimant's condition prior to the expiration of his insured status. See Parsons v. Heckler, 739 F.2d 1334, 1340 (8th Cir.1984). As earlier stated, plaintiff's insured status ended on December 31, 1984, and this fact is not in dispute.
 
 
 34
 However, once a claimant makes out a prima facie case that he cannot perform his usual work due to his disability, the burden of proof then shifts to the Secretary to show that there is work in the national economy which the claimant can perform. See Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir.1985); Allen, 613 F.2d at 145. In this case, the ALJ determined that plaintiff could not perform his usual past work. Thus, the burden fell on the Secretary to show that he was capable of working in some other capacity during the relevant period. The Secretary must prove that, having considered the claimant's present job qualifications, such as age, experience, education, and physical capacity, and the existence of jobs to match those qualifications, the claimant retains the capacity to perform a different kind of job. See Young v. Secretary of Health and Human Services, 925 F.2d 146, 148 (6th Cir.1990); Moon, 923 F.2d at 1181.
 
 
 35
 The Secretary can on occasion satisfy his burden by relying on the medical vocational guidelines; however, where a claimant's functional limitations do not fit the pattern of the medical vocational guidelines, the testimony of a vocational expert may be used to satisfy the Secretary's burden of proof regarding the availability of jobs which the claimant could perform. Id. at 148-49. The grids are not fully applicable if the claimant suffers from a significant non-exertional impairment. See Damron v. Secretary of Health and Human Services, 778 F.2d 279, 282 (6th Cir.1985). A vocational expert is generally consulted where a claimant has significant non-exertional limitations. See Buck v. Bowen, 885 F.2d 451, 455 (8th Cir.1989); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir.1988). The testimony of a vocational expert must be based on a hypothetical question which accurately portrays the claimant's physical and mental impairments. See Varley v. Secretary of Health and Human Services, 820 F.2d 777, 779 (6th Cir.1987).
 
 
 36
 In this case, the ALJ found in his recommended decision on remand that plaintiff Williams had been disabled since March 14, 1988. On review, however, the Appeals Council modified the ALJ's recommended decision and determined that plaintiff became disabled on August 11, 1987.
 
 
 37
 In adjudicating plaintiff's claim, the ALJ followed the five-step sequential evaluation process set forth in the applicable regulations. See 20 C.F.R. §§ 404.1505 and 416.905. The administrative law judge determined that plaintiff could not perform his past relevant work. He also found that plaintiff's alleged cardiovascular disease did not constitute a severe impairment under the Act. However, the ALJ determined that plaintiff had severe impairments consisting of a torn medial meniscus of the right knee, a severe substance abuse disorder, and a passive-aggressive personality disorder. The ALJ determined that claimant's physical impairments limited him to the performance of light work activity, which did not require lifting more than 20 pounds. The ALJ further found that claimant's emotional impairments limit his availability to perform work activities which require significant public or interpersonal contact. The ALJ further found that claimant's mental condition had markedly deteriorated; particularly, his ability to concentrate had deteriorated to the point that by March 14, 1988, he was unable to perform any jobs which existed in significant numbers. On review, the Appeals Council adopted the ALJ's findings, except that the Appeals Council determined that plaintiff exhibited substantial loss of concentration during his August 1987 hospitalization, such that the onset date of his disability was August 11, 1987.
 
 
 38
 Plaintiff's assertions of error relate to the evaluations of his mental impairments by the ALJ and Appeals Council. Due to the special nature of mental impairments, the Secretary is required to follow a special procedure to rate the degree of functional loss imposed by a mental impairment based upon the evidence and conclusions supported by it. 20 C.F.R. §§ 404.1520a and 416.920a. See also Lankford v. Sullivan, 942 F.2d 301, 308 (6th Cir.1991) (per curiam); Buress v. Secretary of Health and Human Services, 835 F.2d 139, 142-43 (6th Cir.1987) (per curiam). In the present case, this procedure was followed by the ALJ in adjudicating plaintiff's claim involving mental impairment. In addition, the ALJ and Appeals Council also correctly recognized that the combined effect of multiple impairments is to be considered in making a determination of disability. See Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 855 (6th Cir.1986).
 
 
 39
 Plaintiff asserts that the professional opinions of Drs. Ablao and Van Ostenberg show that he was disabled as of October 1984. These opinions primarily relate to plaintiff's mental impairment. In order to establish entitlement to disability benefits, a plaintiff must show that his impairment or combination of impairments were of such severity that he was unable to engage in any substantial work which exists in the national economy as of the date that he last qualified for disability coverage. See Deblois v. Secretary of Health and Human Services, 686 F.2d 76, 79 (1st Cir.1982). This burden is not satisfied by a showing that a plaintiff's mental impairment existed prior to the date that plaintiff last qualified for disability coverage. Id. Rather, the mental impairment must be disabling prior to that time.
 
 
 40
 Contrary to plaintiff's assertions, the ALJ did not err in rejecting the opinions of Drs. Ablao and Van Ostenberg as a basis for concluding that plaintiff was disabled by his mental impairments on or before October 1984. In his psychological evaluation of plaintiff dated November 3, 1988, Dr. Van Ostenberg, Ph.D., concluded that plaintiff was not presently employable. He also stated that he did not believe that plaintiff had been employable since around 1980 when his emotional distress and drug usage appear to have escalated to the point that he was non-productive.
 
 
 41
 Dr. Van Ostenberg's opinion, however, does not establish that plaintiff was disabled by October 1984. First, Dr. Van Ostenberg evaluated plaintiff only on one occasion, October 26, 1988. The opinions of physicians or psychologists who have examined a claimant on one occasion or merely reviewed a claimant's record are entitled to less weight than the reports of other physicians who have examined the claimant over a period of time. See Sherrill v. Secretary of Health and Human Services, 757 F.2d 803, 805 (6th Cir.1985). Moreover, Dr. Van Ostenberg's opinion is stated in terms of belief. He did not "believe" that plaintiff was employable, and Van Ostenberg gave no definite date for an onset of disability. Second, Dr. Van Ostenberg cited no data in his evaluation which would support his "belief" that plaintiff became disabled "in 1980 or thereabouts." Dr. Van Ostenberg stated that he was unable to determine the sequence of plaintiff's various treatments. Further, in his evaluation, Dr. Van Ostenberg reviewed various medical reports from 1986 and Dr. Ablao's evaluation of plaintiff from October 1984. Finally, Dr. Van Ostenberg diagnosed organic brain impairment; however, he noted that he did not find any "speculation" in plaintiff's records as to exactly when plaintiff acquired the organic brain impairment.
 
 
 42
 Thus, none of the data cited by Dr. Van Ostenberg in his evaluation related to the year 1980 or immediately thereafter. The ultimate decision of disability is the prerogative of the Secretary. See Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir.1984). Moreover, even the opinion of a treating physician or psychologist is accorded great weight only if the opinion is based on sufficient medical data. See, e.g., Landsaw v. Secretary of Health and Human Services, 803 F.2d 211 (6th Cir.1986); Houston, 736 F.2d at 367. Therefore, the ALJ did not err in rejecting Dr. Van Ostenberg's evaluation as substantial evidence to show that plaintiff was disabled in October 1984.
 
 
 43
 Likewise, the ALJ did not err in rejecting Dr. Ablao's October 1984 evaluation of plaintiff as showing that plaintiff was disabled at that time. Although Dr. Ablao stated that plaintiff's prognosis was guarded after his 1984 evaluation of plaintiff, he also found that plaintiff was spontaneous, logical, relevant, and coherent. He noted that plaintiff exhibited some paranoid thinking and covert hositility, but that in general this was directed toward the VA as a result of their failure to treat his knee. Plaintiff also told Dr. Ablao that he visited friends on occasion, went shopping at times, and did household chores occasionally. Dr. Ablao described plaintiff as in touch with reality as well as cooperative and pleasant at times. Further, plaintiff's responses to Dr. Ablao's questions in October 1984 do not differ markedly from his responses to Dr. Ablao's questions during his evaluation of plaintiff in February 1984. However, in October 1984, Dr. Ablao found plaintiff's prognosis to be guarded while in February 1984, Dr. Ablao found plaintiff's prognosis to be "fair."
 
 
 44
 Thus, it was entirely reasonable for the ALJ and Appeals Council to conclude that Dr. Ablao's diagnosis in October 1984 was not supported by his underlying data and was in contradiction to his earlier findings. Further, as the Appeals Council noted, although Dr. Ablao did find some paranoid thinking and covert hostility on the part of plaintiff, Dr. Ablao noted that this was directed at the VA. As the Appeals Council noted, this anger was rationally directed at the VA, and Dr. Ablao's clinical notes show no evidence that plaintiff was out of touch with reality or suffering from hallucinations or delusions. Moreover, the other evidence of record shows that in September 1984, plaintiff was attending auto mechanic school daily from 9 a.m. to 5 p.m. Although plaintiff was frequently absent, his instructor described him as having good concentration, responding well to direction, and getting along well with the other students. Therefore, the ALJ and Appeals Council did not err in rejecting Dr. Ablao's opinion as substantial evidence for a finding that plaintiff was disabled in October 1984.
 
 
 45
 Accordingly, for the reasons described above, substantial evidence does exist to support the Secretary's finding that plaintiff was not disabled on or before December 31, 1984, the date of the expiration of his insured status. Therefore, because substantial evidence does exist to support the Secretary's finding, the district court did not err in granting summary judgment in favor of the Secretary. See Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988).
 
 III.
 
 46
 For the reasons stated, the district court's grant of summary judgment in favor of the Secretary is AFFIRMED.
 
 
 
 *
 Honorable William H. Timbers, Senior Circuit Judge for the United States Court of Appeals for the Second Circuit, sitting by designation
 
 
 [1]
 It is undisputed between the parties that Williams is entitled to SSI benefits effective August 11, 1987