**Annie E. FOSTER, Plaintiff–Appellant,**

v.

**Otis R. BOWEN, M.D., Secretary of Health and Human Services, Defendant–Appellee.**

No. 87–5887.

United States Court of Appeals, Sixth Circuit.

Argued June 17, 1988.

Decided Aug. 5, 1988.

Alvin D. Wax (argued), Taustine, Post Sotsky, Berman, Fineman and Kohn, Louisville, Ky., for plaintiff-appellant.

Joseph Whittle, U.S. Atty., Louisville, Ky., Suzanne Warner, Terry M. Cushing, William Campbell (argued), for defendant-appellee.

Before MILBURN, GUY and NORRIS, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

The Secretary of Health and Human Services (the Secretary) found that on September 4, 1985, plaintiff, Annie E. Foster, became disabled within the meaning of the Social Security Act (the Act). Plaintiff appeals the Secretary's determination that she first became disabled on that date, arguing that she is entitled to a finding of an earlier date of onset of disability. Because we find that the Secretary's decision was reached in accordance with applicable law and is supported by substantial evidence, we affirm.

I.

Plaintiff was born on March 8, 1932, and has a sixth grade education. For thirteen years, plaintiff worked for Brown & Williamson Tobacco Company. During that time, she lifted metal trays of cigarettes to the back of machines that packed the cigarettes, ran a tobacco bundling machine, filled hoppers with tobacco, operated a labeling machine, and worked as a member of the cleaning crew where her job duties included cleaning wet tobacco out of tubs, washing walls and windows, and mopping and waxing floors. Prior to her employment with Brown & Williamson, plaintiff worked for Catalyst Chemical Company for approximately four months. She had also worked in restaurants making salads. Plaintiff last worked in September of 1981.

On March 28, 1984, plaintiff filed an application with the Secretary of Health and Human Services for disability insurance benefits and supplemental security income (SSI). 42 U.S.C. §§ 423, 1382. Her initial application and request for reconsideration were denied. A hearing was then held before an administrative law judge (ALJ). On April 4, 1985, the ALJ issued a decision denying the award of disability insurance benefits and SSI to plaintiff. The Appeals Council subsequently denied plaintiff's request for review of the ALJ's determination.

Thereafter, pursuant to the Social Security Disability Benefits Reform Act, Pub.L. No. 98–460, 98 Stat. 1794, enacted by Congress in 1984, plaintiff requested the Appeals Council to undertake a redetermination of plaintiff's mental impairment claim based on the Secretary's revised criteria for evaluating such a claim.[1] Thereafter, the Secretary remanded the claim to the Office of Hearings and Appeals. The ALJ then reheard plaintiff's claim and issued a recommended decision on July 21, 1986, finding that plaintiff's condition met the definition of a disability as of September 4, 1985. Thereafter, plaintiff submitted a request to the Appeals Council for review of the ALJ's recommended disability onset date of September 4, 1985. On August 27, 1987, the Appeals Council modified and adopted the decision of the ALJ. This became the Secretary's final decision for purposes of review.

Plaintiff appealed the Secretary's decision to the United States District Court, Western District of Kentucky, where the matter was referred to a magistrate pursuant to 28 U.S.C. § 636(b)(1)(B). The magistrate heard oral argument and on May 1, 1987, issued a report recommending that the Secretary's determination that plaintiff became disabled on September 4, 1985, be upheld and that summary judgment be entered in favor of the Secretary. On June 10, 1987, the district court adopted the report and recommendation of the magistrate and entered summary judgment in favor of

1. In Section 5(a) of the Reform Act, Congress directed the Secretary to promulgate new regulations for claims involving mental impairment. See 98 Stat. 1801. On February 4, 1985, the Secretary published the proposed regulations for such claims, see 50 Fed.Reg. 4,948, and the regulations became effective on August 28 of that year. See 50 Fed.Reg. 35,065.

As implemented, the new procedure for evaluating mental impairments is designed to assist the Department of Health and Human Services in: "(1) Identifying additional evidence necessary for the determination of impairment severity; (2) Considering and evaluating aspects of the mental disorder[s] relevant to [the claimant's] ability to work; and (3) Organizing and presenting the findings in a clear, concise, and consistent manner." 20 C.F.R. §§ 404.1520a(a), 416.920a(a).

the Secretary. Plaintiff now appeals the district court's grant of summary judgment in favor of the Secretary, arguing as follows: (A) the Secretary's finding that plaintiff's mental impairment was not severe prior to September 4, 1985, is not supported by substantial evidence; (B) by definition, the diagnosis of dysthymic disorder required the diagnostician to believe the patient suffered from symptoms of dysthymic disorder for two years prior to that date and the Secretary's finding of onset of disability should be adjusted accordingly; (C) the Secretary failed to properly evaluate plaintiff's mental residual functional capacity; (D) the Secretary failed to consider the plaintiff's impairments in combination; and (E) there is substantial evidence to support a finding that plaintiff's impairment meets or equals the impairments described at section 12.04 of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, App. 1 § 12.04.

## II.

In order to receive disability insurance benefits or SSI, one must be adjudged disabled by the Secretary. 42 U.S.C. §§ 423, 1382. The Secretary will find a claimant disabled if the claimant is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The standard of review in Social Security cases is well established; the Secretary's findings "are not to be overturned unless there is no substantial evidence supporting such conclusions." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 535 (6th Cir.1981). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); *Landsaw v. Secretary of Health and Human Services*,

803 F.2d 211, 213 (6th Cir.1986). It is more than a mere scintilla, but only that much evidence required to prevent a directed verdict. *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 600 (1939). This court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984). Rather, "[i]f the Secretary's findings are supported by substantial evidence then we must affirm the Secretary's decision even though as triers of fact we might have arrived at a different result." *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir.1981).

With these principles in mind we shall proceed to address the claims raised on appeal by plaintiff *seriatim*.

A. Whether There is Substantial Evidence to Support the Secretary's Finding of Disability Commencing September 4, 1985.

The first issue raised by plaintiff is whether the Secretary's finding that plaintiff's disability commenced on September 4, 1985, is supported by substantial evidence. We reiterate that in order to qualify for disability insurance benefits or SSI, the claimant must be disabled. In finding that plaintiff's disability commenced on September 4, 1985, the Secretary reasoned that despite the fact that on April 27, 1984, Dr. Gomez diagnosed plaintiff as suffering from a dysthymic disorder with episodes of depression and occasional crying, the record did not show that at that time or at any other time prior to September 4, 1985, the plaintiff's "mental or emotional state was of such severity as to prevent her from performing 'unskilled' work activities which primarily [sic] working with things rather than with data or people (Rule 202.-00(g), App. 2, Subpart P, Regulations No. 4), including her past unskilled job as a labeling machine operator." The ALJ then considered the combined effects of all her health problems, exertional and nonexertional, severe and not severe, and found that plaintiff had not suffered from any

impairment or combination of impairments which meets or equals the level of severity of any impairment described in Appendix 1, Subpart P, of Social Security Regulation No. 4. The ALJ then concluded that because the plaintiff retained the capacity to perform her past unskilled job as a labeling machine operator (which did not require significant lifting and allowed her to sit or stand) prior to September 4, 1985, a finding that she was not disabled during that time was required.

The Secretary then went on to note that plaintiff sought and received treatment for her mental condition at Seven Counties Local Services, Inc. (Seven Counties), a local mental health agency, on September 4, 1985. An October 11, 1985, letter from that agency states that plaintiff had a diagnosis of dysthymic disorder, that she continued to be depressed, and that she occasionally experienced suicidal ideation. At this time, it was first opined that plaintiff's depression would interfere with her concentration. In June of 1986, a clinical supervisor of Seven Counties noted that plaintiff's condition had deteriorated to the degree that she continued to experience suicidal ideation, she was unable to resolve feelings of hopelessness and helplessness, and her self-concept had deteriorated to the degree that simple tasks of every day living constituted an overwhelming chore. Based upon this and all other evidence introduced, the Secretary held that beginning September 4, 1985 (the date upon which plaintiff first sought treatment at Seven Counties), but not before then, plaintiff's "dysthymic disorder with impaired concentration, restricted daily activities and social functioning, and diminished capacity to adjust to customary work pressures ha[d] been so severe that the claimant ha[d] been unable to perform even 'unskilled' work activities, as described in the Regulations. (20 C.F.R. 404.1560 and 416.960)."

Plaintiff argues on appeal that the record, taken as a whole, supports a finding of disability prior to September 4, 1985. Specifically, plaintiff offers the following evidence in support of this claim: (1) references in the record to the fact that Dr. Anthony Hubbuch prescribed Valium for plaintiff as long ago as 1980, and that his prescription was noted to be for nerves, anxiety, and insomnia; (2) the March 1985 testimony of Reverend Henry Moore Humphrey, Jr., pastor of plaintiff's church, who stated that plaintiff had not attended church regularly during the past four or five years, that he visited her on a regular basis a couple of times per week and found plaintiff depressed and sometimes crying, and that plaintiff was normally still dressed in her robe, although it was afternoon when Rev. Humphrey visited; (3) an April 1984 telephone contact with plaintiff and her daughter made by a Social Security examiner during which plaintiff stated that she does not do anything around the house because of her back and depression, and during which conversation plaintiff's daughter stated that her mother is tense, nervous, and anxious, that she cries easily and finds it difficult to be around people; (4) a psychiatric evaluation written by Dr. Jose Gomez in April of 1984, in which Dr. Gomez reported a diagnosis of dysthymic disorder and stated that plaintiff had difficulty sleeping, had low energy and motivation possibly due to her depression, had "feelings of hopelessness, helplessness, and worthlessness on account of her physical limitations," and that during the period of time since plaintiff had a cervical disc removed surgically (in February of 1981) "she has been suffering from so many somatic complaints she has been depressed most of the time, off and on"; and (5) a June 1986 report from Seven Counties wherein plaintiff's treating therapist stated that plaintiff remained unable to resolve her feelings of hopelessness and helplessness, she expressed low self esteem, and displayed a generalized blunted effect characteristic of depression. We address each of these arguments in the paragraphs that follow.

### 1. Dr. Hubbuch's Records

■ Dr. Hubbuch's records reveal that plaintiff occasionally suffered minor episodes of anxiety and depression during the doctor's treatment of plaintiff's physical condition prior to September 4, 1985, and

that he prescribed Valium during this time period. For instance, in November of 1976, Dr. Hubbuch prescribed Valium when claimant became depressed over her father's death. Despite her depression, claimant continued to work. There is no additional evidence of emotional complaints until August 1980, when claimant told Dr. Hubbuch that she was "tired all the time." Dr. Hubbuch did nothing in response. In February 1981 and several times thereafter, Dr. Hubbuch prescribed Valium for "nerves." Never in his reports, however, does Dr. Hubbuch suggest that plaintiff is disabled by her mental or emotional condition.[2] Contrary to plaintiff's argument, in the absence of such an indication, this evidence does little to establish that plaintiff became disabled by her mental condition prior to September 4, 1985.

### 2. Reverend Humphrey's Testimony

■ Plaintiff argues that the testimony of Rev. Humphrey, taken in March of 1985, is of great significance to her claim of disability prior to September 4, 1985. During the course of his testimony, the reverend noted plaintiff's lack of attendance at church for the preceding four or five years, plaintiff's failure to change out of her bathrobe by mid-afternoon, episodes of crying, and the observation that plaintiff seemed depressed. The reverend did not make statements which would indicate, however, that plaintiff seemed disabled by her mental condition. This evidence also does little to establish that plaintiff was disabled prior to September 4, 1985. Rather, the reverend's testimony is consistent with the April 1984 psychological evaluation of Dr. Gomez (discussed below) in which a diagnosable condition of dysthymic disorder is found, though it is not disabling. In the absence of a disabling condition, plaintiff cannot qualify for the award of disability insurance benefits or SSI.

### 3. Telephone Contact with a Social Security Examiner

■ During an April 1984 telephone interview, plaintiff told a Social Security ex-

aminer that she "[d]oesn't do anything around the house because of her back and depression." Her claim, however, must be contrasted with her sworn testimony wherein she told the ALJ that she cooks, washes dishes, and does her laundry (though she does not dust or vacuum). During the same telephone interview, plaintiff cried and said that she was "depressed, anxious and tense [and that she] cries easily." Plaintiff's daughter made similar statements to the examiner during the telephone interview. Much like the testimony of Rev. Humphrey discussed above, however, this evidence does not establish disability. Rather, it is evidence which is consistent with the diagnosis of a dysthymic disorder that is not disabling.

### 4. Psychiatric Evaluation by Dr. Gomez

■ Dr. Gomez diagnosed plaintiff in April of 1984 as having a dysthymic disorder. At no point, however, did Dr. Gomez say that plaintiff was disabled by her condition. In addition to the observations made by Dr. Gomez which are pointed out in plaintiff's argument as discussed above, Dr. Gomez reported that plaintiff "was well-dressed and punctual," that she was "polite and very appropriate with the interviewer" and that her "[a]ffect was normal [though her] mood was depressed." Additionally, Dr. Gomez reported that claimant "did not appear to be in any great physical or psychological [sic] distress...." Dr. Gomez found no evidence of suicidal tendencies, nor any evidence of psychosis or disillusions or hallucinations. Rather, he found that claimant was "well-oriented for time, place and person," and that "[s]he has good judgment and insight into her problems." Therefore, in contrast to plaintiff's argument, Dr. Gomez's findings indicate that while plaintiff may have suffered from a dysthymic disorder, her condition was not disabling. *See Gray v. Heckler*, 760 F.2d 369, 374–75 (1st Cir.1985) (dys-

---

**2.** In June of 1986, Dr. Hubbuch wrote a one page letter stating that it was his opinion that, at that time, plaintiff was disabled. Dr. Hubbuch's 1986 opinion, however, is consistent with the Secretary's finding of disability commencing September 4, 1985.

thymic disorder, though diagnosable, was not disabling).

### 5. Report from Seven Counties

■ Finally, plaintiff seems to argue that the June 1986 report from Seven Counties indicates that plaintiff was disabled prior to September 4, 1985. This report, however, neither makes reference to plaintiff's condition as of that date nor indicates in any manner whether plaintiff was disabled at that time.

Much of the evidence which plaintiff cites as support for her claim that her disability commenced prior to September 4, 1985, is consistent with the April 1984 diagnosis of Dr. Gomez that plaintiff suffered from dysthymic disorder. However, none of the testimony taken alone or in combination contradicts the Secretary's finding that plaintiff did not become disabled from her mental impairment until September 4, 1985 —the date upon which she first sought treatment for her condition at Seven Counties. The mere fact that plaintiff suffered from a dysthymic disorder prior to September 4, 1985, does not automatically entitle plaintiff to the receipt of benefits. Rather, in order to qualify for the receipt of benefits for the period of time preceding September 4, 1985, plaintiff must show that she was *disabled* by her dysthymic disorder. *Gray*, 760 F.2d at 374–75. Upon review of the record and the arguments submitted by the parties on appeal, we conclude that the Secretary's determination that plaintiff became disabled as the result of her mental or emotional condition on September 4, 1985, and not before then, is supported by substantial evidence, and the plaintiff has failed to prove that she became disabled prior to that date. *See Miller v. Secretary of Health and Human Services*, 843 F.2d 221 (6th Cir.1988).

### B. Whether the Diagnosis of Dysthymic Disorder Requires a Finding of Disability for Two Years' Duration Prior to Diagnosis

■ Plaintiff quotes the Diagnostic and Statistic Manual of Mental Disorders (3d Ed.) (hereinafter DSM–III) which defines dysthymic disorder at section 300.40 as follows:

> The essential feature is a chronic disturbance of mood involving either depressed mood or loss of interest or pleasure in all, or almost all, usual activities and pastimes, and associated symptoms, but not of sufficient severity and duration to meet the criteria for a major depressive episode (full effective syndrome). *For adults, two years' duration is required.* A diagnosis of dysthymic disorder should not be made if an apparently chronic course has been interrupted by a period of normal mood lasting longer than a few months.

DSM–III at 220 (emphasis added). According to this definition, it appears that a dysthymic disorder cannot be diagnosed unless it has persisted for two years. Accordingly, plaintiff argues that the Secretary should have found that plaintiff became disabled either two years prior to the April 1984 diagnosis of Dr. Gomez, or two years prior to her September 1984 visit to Seven Counties. We reiterate, however, that in order to qualify for the award of disability insurance benefits and/or SSI benefits, a claimant must be disabled. The First Circuit has specifically held that a claimant diagnosed as suffering from dysthymic disorder must nevertheless establish that his condition is disabling. *Gray*, 760 F.2d at 374–375. We adopt the position taken by the First Circuit in this regard and conclude that the decision of the Secretary was reached in accordance with applicable law.

### C. Whether the Secretary Improperly Evaluated Plaintiff's Residual Functional Capacity in Relation to Her Mental Impairment by Failing to Consider Certain Testimony

■ Plaintiff claims that the Secretary failed to evaluate and give proper weight to the lay testimony of Rev. Humphrey regarding plaintiff's residual functional capacity as it relates to her mental impairment. In making this argument, plaintiff cites Social Security Rule 85–8 which states in pertinent part:

> The determination of Residual Functional Capacity involves consideration not only of history, findings, and observations

from medical sources, but also of other relevant evidence, such as reports of the individual's activities of daily living, as well as testimony of third parties about the individual's performance and behavior.

We note at the outset of our discussion that plaintiff's claim that the Secretary failed to evaluate the testimony of Rev. Humphrey is dispelled merely upon review of the ALJ's July 21, 1986, recommended decision wherein the reverend's testimony is reviewed. We note further that in the same recommended decision the ALJ specifically found, in accordance with the B criteria of 20 C.F.R. Part 404, Subpart P, App. 1 § 12.04, that the restrictions upon plaintiff's activities of daily living were *moderate;* her difficulties in social functioning were *slight;* she *seldom* experienced deficiencies of concentration, persistence and pace; and that she *never* experienced episodes of deterioration or decompensation in work or work-like settings.

During his testimony, Rev. Humphrey stated that plaintiff had not attended church regularly during the past four or five years, that he visited plaintiff on a regular basis a couple of times per week and found plaintiff depressed and sometimes crying, and that plaintiff was normally still dressed in her robe even though it was afternoon when Rev. Humphrey visited. This testimony is not inconsistent with the Secretary's finding under section 12.04, based upon all of the evidence including the testimony of Rev. Humphrey, that while plaintiff experienced limitations upon her daily living activities, she retained the residual functional capacity, prior to September 4, 1985, to engage in her past employment as a labeling machine operator. Plaintiff has failed to persuade us that the Secretary did not properly evaluate her residual functional capacity as it relates to her mental impairment, and we find that the Secretary reached his decision on this matter in accordance with applicable law.

D. Whether the Secretary Failed to Evaluate Plaintiff's Impairments in Combination

■ The Social Security Act requires the Secretary to consider the combined effects of impairments that individually may be nonsevere, but which in combination may constitute a medically severe impairment or otherwise evince a claimant's disability. 42 U.S.C. § 423(d)(2)(C). Plaintiff claims that the Secretary failed to undertake such an analysis. Once again, plaintiff's claim is dispelled upon a reading of the ALJ's recommended decision of July 21, 1986, wherein the ALJ specifically undertakes such an analysis and states:

Considering the combined effects of all her health problems, exertional and nonexertional and severe and not severe, the undersigned concludes that [prior to September 4, 1985] the claimant has not suffered from any impairment or combination of impairments which meets or equals the level of severity of any impairment described in Appendix 1, Subpart P of Social Security Regulation No. 4.

We therefore conclude that the Secretary properly applied the applicable law regarding consideration of a claimant's impairments in combination, and that plaintiff's claim that the Secretary failed to evaluate her impairments in combination is without merit.

E. Whether the Secretary Erred in Finding that Plaintiff had Failed to Prove that She Suffered From a Mental Impairment Equivalent to a Section 12.04 Affective Disorder

■ Finally, plaintiff claims that her mental impairment is equivalent to an affective disorder under section 12.04 of 20 C.F.R. Part 404, Subpart P, App. 1, and that therefore, because her impairment meets or equals a listed impairment in Appendix 1, she is entitled to a finding of disability without consideration of her age, education, and work experience. *See* 20 C.F.R. § 404.1520(d).

In order to establish an affective disorder under section 12.04, plaintiff must prove, in part, that as a result of her mental condition, she suffers from at least two of the following conditions listed in Subpart B of section 12.04:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which caused the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

We again note that the Secretary concluded that prior to September 4, 1985, and as a result of her dysthymic disorder, the restriction of plaintiff's daily living activities was *moderate;* her difficulty in maintaining social functioning was *slight;* she *seldom* suffered from deficiencies of concentration, persistence, and pace resulting in a failure to complete work in a timely manner; and that she *never* suffered from episodes of deterioration or decompensation in work or work-like settings which caused her to withdraw from that situation or to experience exacerbation of signs and symptoms.

On appeal of the Secretary's findings under the B criteria of section 12.04, plaintiff limits her challenge to the first two findings, i.e., she claims that prior to September 4, 1985, she experienced *marked* restrictions of activities of daily living and *marked* difficulties in maintaining social functioning. *See* 20 C.F.R. Part 404, Subpart P, App. 1 § 12.00(C).

In support of her claim that she suffered from marked restrictions of activities of daily living prior to September 4, 1985, plaintiff asserts that the record shows that she "has not done anything around the house since she had surgery in 1981." In response to this argument, we note plaintiff's sworn testimony of March 13, 1985, taken before the ALJ, during which she states that she washes her dishes, does her laundry, and fixes herself something to eat. With regard to plaintiff's reliance on the testimony of Rev. Humphrey (wherein he stated that plaintiff is often still wearing her robe when he arrives in the afternoon to visit her) as an indication of restriction of activities of daily living, we again note plaintiff's testimony of the same date, wherein she states that she "doesn't get dressed everyday because [she's] not going any place, I have no place to go so it just don't make sense for me to dress up."

According to the regulations, in order to show a "marked" limitation on her activities of daily living, plaintiff must show that her impairment "seriously interfere[s] with the ability to function independently, appropriately and effectively." Plaintiff has simply failed to make this showing for the period preceding September 4, 1985. On the other hand, we conclude that there is substantial evidence to support the Secretary's finding that prior to September 4, 1985, the restriction on plaintiff's activities of daily living caused by plaintiff's dysthymic disorder was moderate and did not rise to the level of a marked restriction.

In support of her argument that prior to September 4, 1985, plaintiff experienced marked difficulty in maintaining social functioning, plaintiff cites the portion of the March 1985 testimony of Rev. Humphrey wherein he stated that plaintiff had not attended church for the past four or five years, and the portion of the April 1984 medical report of Dr. Gomez wherein the doctor noted that plaintiff had stated to him that she had no friends or social life.

In the same report relied on by plaintiff, Dr. Gomez states that plaintiff did not appear to be under any great physical or psychological distress, that she was polite and appropriate, and that her affect was normal. In order to show a "marked" difficulty in maintaining social functioning, plaintiff must show that her impairment "seriously interfere[d] with the ability to function independently, appropriately and effectively." We find that plaintiff's lack of attendance at church and her statement to a physician that she did not have any friends or a social life fail to establish that her dysthymic disorder rose to the level of causing a marked difficulty in maintaining social functioning. Rather, we find that

there is substantial evidence of record to support the Secretary's finding that, prior to September 4, 1985, the limitations caused by plaintiff's dysthymic disorder on plaintiff's ability to maintain social functioning were slight.   AFFIRMED.