23 F.3d 407
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Sandra MARCHLEWICZ-DEBATS, Plaintiff-Appellant,
v.
Donna E. SHALALA, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 93-1124.
 United States Court of Appeals, Sixth Circuit.
 March 29, 1994.
 
 Before: KENNEDY and MILBURN, Circuit Judges; and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Claimant Sandra Marchlewicz-Debats appeals the district court's grant of summary judgment, affirming the Secretary's denial of her claim for disability insurance benefits under the Social Security Act, 42 U.S.C. Sec. 405(g), et seq. On appeal, the sole issue presented is whether substantial evidence exists to support the Secretary's decision that claimant retained the residual functional capacity to perform a restricted range of sedentary work. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 Claimant filed her application for Social Security Disability Benefits on July 14, 1988, alleging a disability onset date of January 4, 1988, due to bilateral carpal tunnel syndrome and ulnar neuropathy. The claim was denied initially and upon reconsideration.
 
 
 3
 Subsequently, a hearing was held before an administrative law judge ("ALJ") on July 17, 1989. In a decision dated October 21, 1989, the ALJ found that claimant was not disabled as defined by the Social Security Act and recommended that benefits be denied. In an order issued on October 16, 1990, the Appeals Council remanded the case to the ALJ for further consideration.
 
 
 4
 A second hearing was held before a different ALJ on February 19, 1991. In a decision dated May 21, 1991, the ALJ found that claimant was not disabled and recommended the denial of benefits. After the claimant filed a request for review of the ALJ's decision, the Appeals Council issued a decision dated November 20, 1991, affirming the ALJ's decision. At that time, the ALJ's decision denying benefits became the final decision of the Secretary.
 
 
 5
 Claimant filed a timely complaint for judicial review of the Secretary's decision in the district court. Thereafter, both parties filed motions for summary judgment, and the matter was referred to a magistrate judge. On June 15, 1992, the magistrate judge issued a report and recommendation. The magistrate judge recommended that claimant's motion for summary judgment be granted and the Secretary's motion for summary judgment be denied, on the grounds that there was not substantial evidence in the administrative record to support the Secretary's findings that claimant had the residual functional capacity to engage in sedentary work and was not disabled.
 
 
 6
 After de novo review of the magistrate judge's report and recommendation in light of the Secretary's objections, the district court rejected the magistrate judge's report and recommendation and granted summary judgment in favor of the Secretary. This timely appeal followed.
 
 B.
 
 7
 Claimant was born on November 15, 1948. She has a high school education. She was employed in various assembly line jobs in the Saginaw Division of General Motors Corporation between 1972 and 1988. Claimant currently receives workers' compensation of approximately $325 per week and a monthly disability pension from General Motors of approximately $600.
 
 
 8
 Claimant has been treated by Dr. Dean Louis, M.D., an orthopedist, on numerous occasions beginning on October 6, 1986. On November 1986, Dr. Louis examined claimant at the University of Michigan Hospital. He diagnosed her condition as exercise-induced compartment syndrome in her right forearm and performed a fasciotomy, i.e., cutting the tendons to allow more space in her forearm. On subsequent physical examination, Dr. Louis found that claimant's wound was healed, that she had a full range of motion of her elbow and wrist, and that her neurovascular status was normal. Dr. Louis recommended various work alterations for claimant, including job rotations or assignments to jobs which required less repetitive work.
 
 
 9
 Claimant saw Dr. Louis for a follow-up examination on January 15, 1987. Dr. Louis found that the surgical incision was well healed, and claimant had a normal neurologic and vascular examination of the hand. Dr. Louis reported that claimant may continue her work without restrictions.
 
 
 10
 In August 1987, claimant returned to Dr. Louis stating that her symptoms had worsened. Claimant's incision was well healed, and she had a full range of motion throughout the right upper extremities. Claimant complained of numbness and tingling near the median nerve; however, her Phalen's and Tinel's signs were negative.
 
 
 11
 Claimant returned to Dr. Louis on October 8, 1987. Prior to this visit, she had an electromyogram, EMG, which showed changes of denervation of the median and ulnar nerves at the wrist. Claimant reported that she had returned to work and had some mild return of her symptoms, including a pain in the arm which radiated into her shoulder. A physical examination revealed a full range of motion in the wrist and elbow, but with some mild decrease in pin prick in the medial nerve distribution. It was agreed that claimant should not work for about four weeks, during which time she would wear wrist splints and take naprosyn.
 
 
 12
 On November 19, 1978, Dr. Louis saw claimant for a follow-up on her bilateral wrist pain and right forearm pain. On examination, she had a full range of motion of both wrists and the right elbow. Neurovascular examination of both upper extremities was intact. Dr. Louis concluded that her bilateral carpal tunnel syndrome may respond to nonoperative therapy.
 
 
 13
 On December 17, 1987, Dr. Wylie, a surgeon, wrote a letter to claimant's employer on her behalf, stating that claimant's condition was slowly improving and that she might be able to return to work in a couple of months. Dr. Wylie stated, however, that it was inadvisable to have her return to a repetitive job; he recommended vocational rehabilitation and job retraining.
 
 
 14
 Claimant returned to Dr. Louis on March 31, 1988, for follow-up treatment. On physical examination, the range of motion was good, and the motion of all joints was normal with no signs of atrophy. Her incision was well healed, and it was reported that claimant should not return to work that involved repetitive wrist motion as that would undoubtedly cause recurrence of her symptomatology.
 
 
 15
 Dr. Hugh L. Sulfridge, an orthopedic specialist, performed an evaluation of claimant on October 13, 1988. Dr. Sulfridge found no restriction of mobility of the shoulder, arm, forearm, wrist, or intrinsic function of the hand. Dr. Sulfridge concluded that objectively the claimant had no untoward reaction from nerve releases, and there appeared to be a normal functioning extremity with intrinsic function of the hand and the dexterity being physiological and normal. Dr. Sulfridge opined that further surgery should be directed toward this extremity. He noted that the production line where claimant worked apparently causes some type of fascitis or tendinitis to her hand and that this dissipated with rest.
 
 
 16
 On numerous occasions claimant was treated, beginning on or about April 10, 1987, by Dr. E. Krieg, D.O., for diabetes.
 
 
 17
 Dr. Mark A. McQuillan, M.D. submitted a report dated January 3, 1990. He had examined claimant for an evaluation of disability for her pension and determined that she was totally and permanently disabled under those standards. Claimant had developed difficulties with carpal tunnel syndrome during her past work, and a right carpal tunnel release had been performed with good results. She developed right arm pain, which resulted in a right flexor forearm fasciotomy with excellent results. However, Dr. McQuillan reported that after returning to work, claimant's forearm swelled and became painful, and she developed a recurrence of carpal tunnel syndrome. She could not perform her past work and was restricted from performing any repetitive action with her right arm. An EMG later confirmed carpal tunnel syndrome on the left arm as well. Work reconditioning was performed which indicated that claimant experienced pain after 18 minutes of repetitive action with the hands and wrists. Other medical problems included insulin dependent diabetes mellitus, fibrocystic breast disease, and a right femur fracture in 1975. Claimant's range of motion was normal in all joints of the arms and strength was normal. Dr. McQuillan concluded that claimant was totally and permanently disabled from any and all occupations.
 
 
 18
 Dr. E.J. Kreig, D.O., examined claimant on February 15, 1991. Dr. Kreig submitted a letter dated February 22, 1991, in which he stated that he agreed with Dr. McQuillan's assessment. Claimant's chief complaints to Dr. Kreig were a burning sensation and soreness in the arms and hands, weakness, and difficulty controlling her diabetes when feeling stress. She stated that she had headaches and blurred vision when her sugar level was up and had occasional episodes of hypoglycemia. She also felt a pins-and-needles sensation around her mouth when anxious and experienced anxieties about her inability to work. Claimant's grip was subnormal bilaterally with a normal range of motion in the upper extremities. Laboratory tests revealed diabetes which was uncontrolled due to emotional stresses. Blood sugars had ranged into the high 200s at times. Dr. Kreig concluded that claimant was unable to perform any substantial gainful activity due to inability to perform repetitive actions that involved strength of her hands, wrists and arms, emotional stress, and anxiety which caused her diabetes to become uncontrolled or difficult to manage.
 
 
 19
 Neil B. Yake, Ph.D., a psychologist, submitted an undated note concerning his counseling of claimant on five occasions through January 10, 1991. He circled entries on a form indicating that claimant had improved with treatment, and her attendance was regular. In handwritten notes, he stated that claimant was making progress and that her prognosis was guarded under conditions, both physical and vocational. He also commented that claimant had an adjustment reaction with moderate to severe anxiety mixed with depression.
 
 
 20
 Dr. John S. Campbell, M.D., performed a consultative orthopedic evaluation on April 4, 1991. Dr. Campbell had treated claimant in 1975 for a right femur fracture. This fracture healed well, and claimant walked without a limp. Dr. Campbell's evaluation was for the upper extremities. Claimant advised Dr. Campbell that she was awkward in using her right hand, had discomfort in her left hand, and that she had also been diagnosed with brittle diabetes. She further stated that she did not wear her night splints as she had in the past and that she was seeing a psychologist and also a psychiatrist. On physical examination, there were well-healed surgical scars in the upper right forearm which were slightly tender. The range of motion was excellent with a slight discomfort on full flexion. There was slight atrophy of the hypothenar muscle of the right hand, but no sensory changes. Sensation was normal. The right grip was 35, compared with 59 on the left. Examination of the left hand was negative. Dr. Campbell concluded that there was evidence of continued mild residual median nerve irritation and neuropathy on the right but no indication for further surgery. Dr. Campbell stated that he believed claimant could be helped by again wearing night splints under each forearm and continuing to be as active as possible using the upper extremities, until pain developed.
 
 
 21
 A consultative psychiatric evaluation was performed on April 18, 1991, by Dr. Sumer Aygen, M.D. At that time, claimant complained of carpal tunnel syndrome and stated she was upset, frustrated, and angry about repeated examinations ordered by Social Security. Claimant stated that she had been a heavy drinker in the past but stopped drinking in 1982. She complained about anger and stress, stating that stress affected her diabetes. While working, she had problems with her foreman and co-workers because she felt they ridiculed her.
 
 
 22
 Dr. Aygen observed that claimant was appropriately dressed, clean, and had good reality contact. However, she displayed a wide range of emotions, was guarded and defensive, and misinterpreted words. She appeared to be an independent person, but had an underlying dependency problem. Her speech was normal and her thought processes well-organized with no signs of psychosis. She had a sense of worthlessness and an occasional suicidal ideation. Somatic functions were disturbed with broken sleep, lack of appetite and energy, taking naps, headaches, chest tightness, palpitations, nausea, numbness around the mouth, and vague pain complaints. There were signs of low frustration tolerance and difficulty in impulse control. Her memory was good but there were signs of concentration problems related to anxiety.
 
 
 23
 Dr. Aygen's diagnosis was chronic alcoholism in remission and borderline personality disorder, but dysthymic disorder and other anxiety disorders were ruled out. Dr. Aygen completed a medical assessment of claimant's ability to do work related activities, indicating that she was moderately limited in her ability to maintain attention and concentration for extended periods and in working in coordination with or in proximity to others without being distracted by them. Additionally, she was limited in her ability to complete a normal work day and work week without interruption from psychologically based symptoms, to perform at a consistent pace with a reasonable number and length of rest periods, and was limited in her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.
 
 
 24
 Timothy Shaner, a vocational expert, testified at the second hearing. He described claimant's past relevant work as being unskilled with light exertion. Based upon a hypothetical in which the ALJ assumed that claimant could perform a restricted range of unskilled sedentary work, with an option to sit and stand, with maximum consideration given to her upper extremity deficit and with the work being low in stress, the vocational expert identified the following positions which claimant could perform: information clerk, approximately 2,800 positions; charge account clerk, approximately 1,500 positions; security monitor, 4,350 positions; and order clerk, 3,435 positions. The vocational expert testified that a job such as a non-intervening security monitor would accommodate claimant's upper extremity deficit because the primary use of the upper extremities would be the occasional use of a telephone. He also testified that a charge account clerk would accommodate her upper extremity deficit because the position would involve assisting customers in filling out a credit application, with the customer primarily doing the writing.
 
 
 25
 When asked to assume that the claimant had testified in an entirely credible manner, the vocational expert testified that, with her upper extremity deficit and the extensive napping, periods of nausea, and mental numbness stemming from her diabetes, he did not believe there were any jobs she could perform. On cross-examination, the vocational expert also admitted that if claimant's carpal tunnel syndrome prevented her from holding anything, such as a pen or pencil in her hand, then the security monitor position would be the only position she could perform.
 
 II.
 
 26
 Pursuant to 42 U.S.C. Sec. 405(g), this court has jurisdiction to review the Secretary's decisions. Judicial review of the Secretary's decision is limited to determining whether the Secretary's findings are supported by substantial evidence and whether the Secretary employed the proper legal standards in reaching her conclusion. See Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See Kirk v. Secretary of Health & Human Servs., 667 F.2d 524, 535 (6th Cir.1981), cert denied, 461 U.S. 957 (1983). We do not the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility. See Garner v. Heckler, 745 F.2d 383, 387 (6th Cir.1984).
 
 
 27
 In determining whether the Secretary's factual findings are supported by substantial evidence, we must examine the evidence in the record taken as a whole and must take into account whatever in the record fairly detracts from its weight. See Born v. Secretary of Health & Human Servs., 923 F.2d 1168, 1173 (6th Cir.1990). If supported by substantial evidence, the Secretary's decision must be affirmed even if a reviewing court would decide the matter differently, see Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir.1983) (per curiam), and even if substantial evidence also supports the opposite conclusion, see Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir.1986) (en banc).
 
 
 28
 A social security disability claimant bears the ultimate burden of proof on the issue of disability. See Richardson v. Heckler, 750 F.2d 506, 509 (6th Cir.1984). However, once a claimant makes out a prima facie case that she cannot perform her usual work due to her disability, the burden of proof then shifts to the Secretary to show that there is work in the national economy which the claimant can perform. Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir.1985); Allen v. Califano, 613 F.2d 139, 145 (6th Cir.1980). The Secretary must prove that having considered the claimant's present job qualifications, such as age, experience, education, and physical capacity, and the existence of jobs to match those qualifications, the claimant retains the capacity to perform a different kind of job. See Young v. Secretary of Health & Human Servs., 925 F.2d 146, 148 (6th Cir.1990). A vocational expert is generally consulted where a claimant has significant non-exertional limitations. See Buck v. Bowen, 885 F.2d 451, 455 (8th Cir.1989); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir.1988). The testimony of a vocational expert must be based on a hypothetical question which accurately portrays the claimant's physical and mental impairments. See Varley v. Secretary of Health & Human Servs., 820 F.2d 777, 779 (6th Cir.1987).
 
 
 29
 In his decision of May 21, 1991, the ALJ determined that claimant had not engaged in substantial gainful activity since January 4, 1988; that claimant has severe carpal tunnel syndrome, depression, personality disorder, and alcohol addiction; that she did not have an impairment or combination of impairments that met or equaled a listed impairment; and that she did not have the residual functional capacity to perform her past relevant work as an assembler. However, he determined that claimant has the residual functional capacity to perform a full range of sedentary work in a non-hazardous environment, reduced by the need for an option to sit or stand and an inability to tolerate more than low stress, as well as an inability to use the upper extremities for production line type (repetitive) work. He further determined that using the residual functional capacity set forth above, there were a significant number of jobs in the national economy which claimant could perform.
 
 B.
 
 30
 Claimant argues that the ALJ erred in finding that despite the severe impairments and the limitations placed upon her by those impairments, she could still perform a limited range of sedentary work. In reaching the conclusion that claimant could perform a limited range of sedentary work, the ALJ found that claimant's testimony regarding pain and the limitations arising from her impairments was not fully credible. Claimant asserts that the ALJ erred in evaluating her subjective complaints of pain, that the ALJ should have found that her diabetes and mental impairment were severe, that the ALJ failed to give weight to her treating physicians, and that the ALJ's hypothetical to the vocational expert was flawed because it did not take into account her diabetes.
 
 
 31
 First, claimant argues that the ALJ did not fully credit her complaints of disabling pain. Subjective complaints of pain may support a claim for disability. Duncan v. Secretary of Health & Human Servs., 801 F.2d 847, 852 (6th Cir.1986). When a claimant alleges disability due to pain or other symptoms, the ALJ first examines whether there is objective medical evidence of an underlying medical condition. If there is, the ALJ examines whether (1) objective medical evidence confirms the severity of the alleged pain arising from the condition or (2) the objectively established medical condition is of such severity that it can reasonably be expected to produce the alleged disabling pain. Blacha v. Secretary of Health & Human Servs., 927 F.2d 228, 230 (6th Cir.1990) (per curiam). Moreover, in applying this standard, the reviewing court should show deference to the administrative law judge in assessing credibility. Tyra v. Secretary of Health & Human Servs., 896 F.2d 1024, 1030 (6th Cir.1990).
 
 
 32
 In this case, the medical evidence shows that claimant suffers from carpal tunnel syndrome which is exacerbated by repetitive hand movements. However, substantial evidence supports the ALJ's conclusion that the extent of the function limitations claimed by claimant was not credible. The record shows that after she stopped her employment, which involved repetitive use of her hands, the claimant stopped using the wrist splints which had been recommended for her condition. Further, the only pain medication which claimant took was extra-strength tylenol. The use of only mild medications undercuts complaints of disabling pain. Blacha, 927 F.2d at 231.
 
 
 33
 Moreover, claimant's testimony shows that she participates in a wide range of activities. She spends a typical day taking walks, preparing meals, reading, window shopping, and watching television. She also visits with friends and family, goes to the movies and Alcoholics Anonymous meetings. Claimant also does household work, takes care of her personal needs, and drives an automobile. The variety of activities which a claimant is able to perform is a factor to be considered in determining whether her complaints of pain were credible. See Bradley v. Secretary of Health & Human Servs., 862 F.2d 1224, 1227 (6th Cir.1988) (per curiam).
 
 
 34
 Finally, contrary to claimant's assertions, the fact that the ALJ found that claimant lacked an incentive to work because the unskilled sedentary jobs she could perform would pay less than the approximately $24,000 per year in benefits which she receives from her disability pension and workers' compensation does not affect the validity of the ALJ's conclusions regarding the credibility of her complaints of subjective pain. See Mullen v. Bowen, 800 F.2d 535, 547 (6th Cir.1986).
 
 
 35
 Next, claimant argues that the ALJ should have found that her diabetes is a severe impairment. It is clearly established in the record that claimant has suffered from diabetes mellitus since sometime in 1988. In his opinion, the ALJ noted:
 
 
 36
 At the second hearing, the claimant emphasized diabetes rather than her hands as the disabling impairment, stating that her blood sugar levels were high enough for her to feel sick at times. However, this finally was never recorded in the medical evidence. While Dr. Krieg stated that the claimant's diabetes was difficult to control, no specific blood sugar levels were ever stated.
 
 
 37
 R. 40. In a progress note dated November 4, 1988, Dr. Krieg diagnosed diabetes mellitus, poor control, and stated that claimant's FBS at home has been ranging from 260 to 268. In a letter dictated on February 25, 1991, Dr. Krieg stated that claimant had uncontrolled diabetes mellitus, which was thought to be uncontrolled due to emotional stresses. Dr. Kreig also stated that claimant's "blood sugars (sic) range up into the high 200s at times." R. 278. However, there is no objective medical evidence attached to either the letter or progress note from Dr. Kreig which would document his conclusory statements about claimant's blood sugar levels. However, in his report dated October 13, 1988, Dr. Sulfridge described claimant's diabetes as a marginal diabetic situation. Moreover, in a progress report dated July 18, 1989, Dr. R. Toroyan, D.O., diagnosed diabetes mellitus, type I, and stated that claimant's "sugar has been a problem ... but I do not think at this point in time the sugar would prevent her from going back to work." R. 219.
 
 
 38
 Based upon the lack of objective medical evidence establishing the severity of claimant's diabetes mellitus, substantial evidence supports the ALJ's finding that claimant's testimony concerning the degree of limitation stemming from her diabetes was not credible. Further, because there is little, if any, evidence of record concerning the severity of claimant's diabetes, other than Dr. Toroyan's statement that he did not believe that claimant's diabetes would prevent her from returning to work, the ALJ did not err in finding that claimant's diabetes was not a severe impairment. See Foster v. Bowen, 853 F.2d 483, 489 (6th Cir.1988) (mere diagnosis of an impairment does not mean it is disabling).
 
 
 39
 Third, claimant argues that the ALJ erred in finding that she did not have a disabling mental impairment. However, the ALJ did find that claimant's depression and personality disorder were severe impairments. Further, using the OHA Psychiatric Review Technique Form, the ALJ found that claimant was not restricted in the activities of daily living, had moderate difficulties in maintaining social functioning, often had deficiencies of concentration, persistence or pace, resulting in failure to complete tasks in a timely manner, and never had episodes of deterioration or decomposition in work or work-like settings.
 
 
 40
 These conclusions by the ALJ are supported by substantial evidence. Claimant's testimony and her activity sheets show that she engaged in a wide variety of activities including caring for her home and personal needs. Further, there is absolutely no evidence of episodes of deterioration or decomposition in work or work-like settings in the record.
 
 
 41
 Furthermore, in his report, Dr. Aygen found no marked limitations in any area in which he evaluated claimant, and he found a number of areas in which she was functioning normally or not significantly limited. Dr. Aygen found claimant moderately limited in working with others but noted that she had good relationships. In addition, Dr. Yake, claimant's treating psychologist, found her condition guarded but improved. R. 281. Finally, neither Dr. Yake nor Dr. Aygen stated an opinion regarding claimant's employability. Therefore, the ALJ's finding that claimant's psychological or mental symptoms did not interfere with her activities of daily living but would restrict her to jobs with low stress is supported by substantial evidence.
 
 
 42
 Claimant argues that the district court failed to give appropriate weight to the opinions of her treating physicians that she was disabled. A treating physician's opinion is entitled to great weight only if it is supported by sufficient medical data. Landsaw v. Secretary of Health & Human Servs., 803 F.2d 211, 213 (6th Cir.1986). However, the ultimate determination of disability rests with the Secretary, and not with the treating physician. Houston v. Secretary of Health & Human Servs., 736 F.2d 365, 367 (6th Cir.1984). Moreover, the Secretary is not bound by a treating physician's conclusory statements. King v. Heckler, 742 F.2d 968, 973 (6th Cir.1984).
 
 
 43
 In this case, the treating physicians' conclusions that claimant was disabled would not justify a finding of permanent disability. First, Dr. McQuillen evaluated claimant once, on January 3, 1990, to determine if she was considered disabled under the terms of General Motors' pension plan. He concluded that she was totally and permanently disabled for any position at GM. However, this is consistent with the ALJ's conclusion that claimant could not return to her past relevant work. Further, Dr. McQuillen's evaluation for the pension plan was not a Social Security disability determination, and there is no indication that the disability criteria for the GM plan is the same as the criteria for receipt of Social Security disability benefits. See Clark v. Sullivan, 891 F.2d 175, 177 (7th Cir.1989) (unlike workers' compensation, the Social Security Act does not contemplate degrees of disability or allow for an award based upon partial disability).
 
 
 44
 Further, although Dr. Krieg, a treating physician, submitted a letter dated February 22, 1991, stating that claimant was not able to perform substantial gainful activities because of her inability to do repetitive motions, anxiety, and uncontrolled diabetes, Dr. Krieg's letter is unsupported by accompanying objective medical data and is, therefore, conclusory.
 
 
 45
 In addition, none of the other physicians who saw claimant, either as a treating physician or only once, opined that she was disabled. Indeed, Dr. Louis, who treated claimant for her carpal tunnel syndrome for a lengthy period of time, stated that claimant should "continue to try to find an occupation that does not involve repetitive maneuvers." R. 196. Thus, the ALJ did not ignore the opinions of claimant's treating physicians, and substantial evidence supports the ALJ's findings.
 
 
 46
 Finally, claimant argues that the vocational expert's opinion is not substantial evidence which supports the Secretary's burden of showing that there are a significant number of jobs in the economy which claimant could perform. Claimant argues that the hypothetical was defective because it failed to take into account claimant's diabetes. However, as noted above, substantial evidence supports the ALJ's conclusion that claimant's diabetes is not a severe impairment, and there is no objective evidence in the record which established that claimant's diabetic condition limits her ability to work in any way. The testimony of a vocational expert is substantial evidence if the hypothetical question made to the vocational expert accurately portrays the claimant's individual physical and mental impairments. Varley v. Secretary of Health & Human Servs., 820 F.2d 777, 779 (6th Cir.1987). However, where the hypothetical question is supported by the evidence in the record, it need not reflect unsubstantiated allegations by the claimant. Blacha v. Secretary of Health & Human Servs., 927 F.2d 228, 231 (6th Cir.1990). In this case, the evidence does not show that claimant has any restrictions on vocational ability beyond those incorporated into the ALJ's hypothetical question to the vocational expert. Thus, substantial evidence supports the ALJ's finding that claimant can perform a significant number of jobs in the national economy.
 
 III.
 
 47
 For the reasons stated, the district court's grant of summary judgment is AFFIRMED.